**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.

ANTHONY A. MOORE,

    *Defendant.*

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 4:25-cr-00103-JMD

**<u>SENTENCING OPINION</u>**

The Court issues this opinion to explain why, contrary to common belief, Supreme Court precedent does not prohibit capital punishment for nonhomicide sexual offenses against children.  Instead, a person who commits sexual offenses against a child can obtain relief under the Eighth Amendment from capital punishment only if he can prove that "there is a national consensus against capital punishment for th[at] crime." *Kennedy v. Louisiana*, 554 U.S. 407, 434 (2008).  The Supreme Court's factual finding that a national consensus existed in 2008 against capital punishment for rape offenses involving children does not foreclose a court from finding, two decades later, that any national consensus is long gone and that those who harm children may now be executed.

Anthony Moore repeatedly raped a child and created images of child pornography. Historically, offenders like him could have faced capital punishment.  He instead faces a statutory maximum of 20 years, less than the maximum sentence authorized for certain felons in possession of a firearm, 18 U.S.C. § 924(e), or drug dealers, 28 U.S.C. § 841(b)(1)(A)–(B).  Until recently, prosecutors and legislators have not sought capital punishment for crimes involving sexual offenses against children because of a common perception that

1

*Kennedy* categorically prohibits the death penalty for nonhomicide sexual offenses against children.

That perception is wrong. *Kennedy* said nothing at all about child pornography offenses (or offenses, like this one, involving both rape and child pornography). As for child rape offenses, *Kennedy* interpreted the Eighth Amendment to forbid punishments inconsistent with the "evolving standards of decency." 554 U.S. at 435. Although *Kennedy* concluded that those standards prohibited capital punishment in 2008, two decades have passed since then. Standards can evolve in either direction. *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 990 (1991) (principal opinion of Scalia, J.) ("The Eighth Amendment is not a ratchet, whereby a temporary consensus on leniency for a particular crime fixes a permanent constitutional maximum, disabling the States from giving effect to altered beliefs and responding to changed social conditions."). *Kennedy* itself said that the question of constitutionality changes over time and is based on the social "norms that '*currently* prevail.'" 554 U.S. at 419 (emphasis added; citation omitted). And *Kennedy* made clear that those standards can change in as few as 15 years, leading to different bottom-line outcomes. *Id.* at 432.

Today's standards look quite different from those in 2008. In the last three years, at least six States enacted new legislation permitting capital punishment for the crime of child rape. And following recent changes in technology, the rate of sexual offenses against children has skyrocketed. These crimes cannot accurately be described solely as crimes against individual victims. The images and videos too often produced from these crimes persist on the internet for decades—if not forever—so they harm not just the individual victims, but society as a whole. The Supreme Court in 2008 found a national consensus against capital punishment for child rape and concluded that the most decent thing was to take capital

punishment off the table.  But in the face of extraordinary increases in crimes against children, plus paradigm changes in the legal and technological landscape, policymakers and prosecutors may determine that the most decent thing is to impose the most serious penalty on those who harm the most innocent.  *Kennedy* does not prohibit that development.  Unless a criminal offender satisfies an extraordinarily demanding evidentiary burden, Supreme Court precedent permits imposing capital punishment on those who commit nonhomicide sexual offenses against children.

### Analysis

I.    **The "evolving standards of decency" test departs from the Supreme Court's predominant historical approach and might no longer be valid precedent.**

It is a fundamental imperative—core to democracy itself—that our Constitution changes only when the People amend its text.  "[T]he meaning of constitutional text is fixed at the time of its ratification" because "[r]atification is a democratic act that renders constitutional text part of our fundamental law."  *United States v. Rahimi*, 602 U.S. 680, 737 (2024) (Barrett, J., concurring).  The only expressive content of the Constitution is its text, which must mean what it meant at the time of enactment because no lawmaker can predict future linguistic change.  The text thus "remains law until lawfully altered"—that is, amended.  *Id*. (quoting Stephen E. Sachs, *Originalism: Standard and Procedure*, 135 Harv. L. Rev. 777, 782 (2022)).

This fundamental principle was well established at the Founding in all three branches.  When founders in the executive branch debated the constitutionality of creating a national bank, "both sides relied on originalist interpretive methods."  William H. Pryor Jr., *Against Living Common Goodism*, 23 Federalist Soc'y Rev. 24, 37 (2022).  In the legislative branch, James Madison, the "Father of the Constitution" himself, did the same.  He explained that the "right interpretation" of the Constitution should be determined by identifying "the

meaning of the parties to the instrument," which could be assessed through "[c]ontemporary and concurrent expositions." 2 Annals of Cong. 1945–46 (1791). As for the judiciary, an early example of this methodology comes from Chief Justice Marshall's opinion in *Ogden v. Saunders*, 25 U.S. 213 (1827). There, the Supreme Court said that the meaning of "the constitution of the United States" is "collected from its words," which "are to be understood in that sense in which they are generally used by those for whom the instrument was intended"—*i.e.*, the public at the time of ratification. *Id.* at 332.

Although there have been periods in history where the Supreme Court deviated from this standard way of reading the Constitution, this method is the Supreme Court's current preferred methodology. For example, the Supreme Court recently declared that "[t]he Constitution allows capital punishment" specifically because it was permitted at the Founding and no later-added text outlawed it. *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019); *see also id.* at 130 (because of this historical meaning, "the judiciary bears no license to end a debate reserved for the people and their representatives").

The Supreme Court departed from this traditional understanding when it crafted the "evolving standards of decency" test. That test, created in 1958, declared that the prohibition against "cruel and unusual punishment" in the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 99–101 (1958). This test asks not what "cruel and unusual" meant "when the Eighth Amendment was adopted in 1791," but instead what it means today, according to "the norms that 'currently prevail.'" *Kennedy*, 554 U.S. at 419. It is this standard that the Supreme Court used in 2008 to prohibit enforcement of a Louisiana statute that permitted capital punishment for offenders who raped children. *Id.* at 446–47. The Supreme Court did not dispute that capital punishment for child rape had been authorized at the Founding and

4

was constitutionally permissible for the next 200 years.  It instead concluded that Louisiana could not enforce its law because, as of 2008, "there is a national consensus against capital punishment for the crime of child rape."  *Id.* at 434.

*Kennedy* may no longer be controlling precedent.  The methodology in the Supreme Court's 2019 *Bucklew* decision is starkly different from *Kennedy*.  Faced with the question whether the Eighth Amendment prohibited Missouri from using a method of lethal injection that the offender contended would be painful, the Court did not assess—or even mention— evolving standards of decency.  Instead, in an express return to the traditional method of analysis that has long prevailed in the Supreme Court for most of the country's history, the Court asked whether Missouri's plan to execute the offender was consistent "with the original and historical understanding of the Eighth Amendment."  *Bucklew*, 587 U.S. at 136.  Rather than assess the "norms that 'currently prevail,'" *Kennedy*, 554 U.S. at 419, *Bucklew* asked what "a reader at the time of the Eighth Amendment's adoption would have understood," and it assessed 18th-century "[c]ontemporary evidence," 587 U.S. at 130–31.

Subsequent developments further suggest *Kennedy* might no longer be controlling.  A case decided one year after *Bucklew* described the "evolving societal standards" test as one "eschewed" by those who follow today's predominant methodology that focuses on "the original understanding of the Eighth Amendment."  *See United States v. Briggs*, 592 U.S. 69, 78 (2020).  Just as important, the Supreme Court has not relied on the "evolving standards of decency" test since before *Bucklew*.  *E.g.*, *City of Grants Pass, Or. v. Johnson*, 603 U.S. 520 (2024); *United States v. Tsarnaev*, 595 U.S. 302 (2022); *Jones v. Mississippi*, 593 U.S. 98 (2021); *Barr v. Lee*, 591 U.S. 979 (2020) (per curiam); *Madison v. Alabama*, 586 U.S. 265 (2019).  The Supreme Court's refusal to use a test can signify abandonment of that test.  For example, after the Ninth Circuit relied on a test established in *Lemon v. Kurtzman*, 403 U.S.

602 (1971), the Supreme Court criticized the Ninth Circuit for having "overlooked" that the Supreme Court had "long ago abandoned *Lemon*" even though the Supreme Court had never overturned *Lemon* explicitly. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022). Because later cases were inconsistent with *Lemon*, lower courts should have understood that *Lemon* was no longer good law. *See id.*; *see also Am. Legion v. Am. Humanist Assn.*, 588 U.S. 29, 49 (2019) (plurality opinion) (describing how the Supreme Court "simply ignored" *Lemon* in many decisions); *Grants Pass*, 603 U.S. 520 (ignoring the "evolving standards of decency" test). To the extent *Bucklew* is inconsistent with *Kennedy* and the Supreme Court has "simply ignored" the "evolving standards of decency" test, *Kennedy* too might have already faced the same fate as *Lemon*.

## II. The "evolving standards of decency" test nonetheless still permits reinstating historical penalties.

Ultimately, it might make no difference whether *Kennedy* is still good precedent. Even assuming it is, a prosecutor can, consistent with that decision, pursue capital punishment against offenders who commit nonhomicide sexual offenses against children. That is true for two reasons.

**1.** Under *Kennedy*, if social attitudes change, so too does the constitutional rule. The threshold question under the "evolving standards of decency" test is whether the criminal defendant can prove "a consensus against the death penalty for child rape." *Id.* at 446; *see also id.* at 434 (making clear that the consensus must be "national"). That question must be answered anew each time a case is litigated because it requires looking at the societal "norms that '*currently* prevail,'" the norms that exist today, "at *this stage* of evolving standards." *Id.* at 419, 447 (emphasis added). If the "national consensus" against capital punishment for child rape that *Kennedy* found in 2008 has disappeared in the subsequent two decades, then so too has any prohibition on capital punishment for that crime.

6

Several times in death penalty cases, the Supreme Court has concluded that changed facts warranted a bottom-line outcome different from its previous decisions. And critically, it did so without holding that its previous decisions were wrongly decided. The Supreme Court, for example, held that nothing in the Constitution prohibited "executing mentally retarded people convicted of capital offenses," because there was "insufficient evidence of a national consensus" against that penalty. *Penry v. Lynaugh*, 492 U.S. 302, 335 (1989). Thirteen years later, the Court held the opposite. *Atkins v. Virginia*, 536 U.S. 304, 316 (2002). But the Court did not overrule *Penry*. That case had been correct when decided, but "[m]uch ha[d] changed" factually since then. *Id.* at 314. Unlike in 1989, by 2002 it had become "fair to say that a national consensus has developed against" capital punishment for those offenders. *Id.* at 316. Sixteen States had abolished the practice in those 13 years. *Id.* at 314–15.

The Supreme Court did the same thing when assessing whether the government can execute minors. The same year as *Penry*, the Supreme Court ruled that States can execute capital offenders who commit crimes as juveniles. *Stanford v. Kentucky*, 492 U.S. 361 (1989). In 2005, the Supreme Court held the opposite because it concluded that a "national consensus against the death penalty for juveniles" had developed in the previous 16 years. *Roper v. Simmons*, 543 U.S. 551, 564 (2005). Again, the Supreme Court did not overrule *Stanford*; it instead determined that the consensus had changed, so the conclusion had to change as well. Indeed, it *affirmed* the Missouri Supreme Court, *id.* at 578–79, which had declined to apply the bottom-line result from *Stanford* and had instead assessed whether the country had arrived at a national consensus since *Stanford*, *see State ex rel. Simmons v. Roper*, 112 S.W.3d 397, 407 (Mo. 2003). Under these cases, if the consensus changes, the test's "applicability must change" as well. *Kennedy*, 554 U.S. at 419 (citation omitted). Although lower courts

must apply the same legal test as *Kennedy* (to the extent it has not been overruled), the outcome of that legal test changes as the facts change.

In other contexts, the Supreme Court regularly stresses that applying the same legal test to different facts may lead to different outcomes. A judicial decision typically "focus[es] on the factual situation before [the court]," not other facts. *New York v. Ferber*, 458 U.S. 747, 768 (1982). Decisions "should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." *Turkiye Halk Bankasi A.S. v. United States,* 598 U.S. 264, 278 (2023) (cleaned up); *accord Buford v. United States*, 532 U.S. 59, 65–66 (2001) (previous cases often "provide only minimal help when other courts consider" later cases with different factual "circumstances"). An even starker example occurs when the facts change *within* a case, rather than between cases. Parties can seek relief from an injunction when they show "a significant change either in factual conditions or in law." *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (citation omitted). When *Kennedy* was decided in 2008, the Supreme Court made a fact finding that a "national consensus" existed against the death penalty for child rape cases. That finding rested on factual assertions that may not remain true two decades later in a record developed for a different case.

Despite all this, some commentators have suggested that the Eighth Amendment is a "one-way ratchet"; as soon as the Supreme Court blocks a form of punishment, it can never be brought back. *See, e.g.*, Alexandra L. Klein, *Kennedy v. Louisiana and the Future of the Eighth Amendment*, 52 Pepp. L. Rev. 293, 300 & n.30 (2025) (citing examples of this argument). And to be sure, some broad language in *Kennedy* could be read that way. But that argument conflicts with other language of *Kennedy* and similar decisions, which stress that the "applicability [of the test] must change as the basic mores of society change."

*Kennedy*, 554 U.S. at 419 (citation omitted).  Indeed, the Supreme Court has at least once revisited findings after limiting capital punishment.  In a case about whether courts could imprison minors for life without parole, the Supreme Court reassessed *Roper's* factual conclusions with the benefit of a new record.  It examined whether "recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles," *Graham v. Florida*, 560 U.S. 48, 68 (2010), observations that had been a critical part of the fact finding in *Roper* of a national consensus against executing minors, 543 U.S. at 570–71.  Based on that data, *Graham* adopted the same fact findings previously adopted.  *Graham*, 560 U.S. at 68.  There would have been no reason to reassess those previous findings if the Eighth Amendment operated as a one-way ratchet.

Another potential source of confusion is *Kennedy's* discussion about proportionality.  After finding a national consensus against a particular penalty, *Kennedy* and other cases then proceeded to determine whether "the death penalty is disproportionate to the crime committed" under "Eighth Amendment proportionality precedents."  *Kennedy*, 554 U.S. at 421, 426.  But those passages do not displace the need to first determine whether there is a national consensus against the punishment.  The Supreme Court has "never invalidated a punishment" under a proportionality analysis without first finding a national consensus against the challenged punishment.  *Stanford*, 492 U.S. at 379 (principal opinion of Scalia, J.).  Although "[c]onsensus is not dispositive," *Kennedy*, 554 U.S. at 421, it is necessary.  Courts apply separate proportionality analysis "in cases *involving* a consensus."  *Atkins*, 536 U.S. at 313 (emphasis added), not cases involving no consensus.  That makes sense because the proportionality precedents themselves call on courts to assess the "standards" recognized by "society," which are "entitled to great weight," *Kennedy*, 554 U.S. at 434–35, an inquiry that overlaps substantially with the question whether there is a national consensus.  *See also*

*Stanford*, 492 U.S. at 380 (principal opinion of Scalia, J.) (remarking that the two questions "blend into one another"). Indeed, if courts could invalidate historically permitted punishments without first finding a national consensus against the punishment, then the extensive discussion of national consensus in *Penry*, *Stanford*, *Atkins*, *Roper*, *Kennedy*, and other cases would have been unnecessary.

In short, the "evolving standards of decency" test is a two-part test: a court first determines whether there is a national consensus against a punishment, and then it applies proportionality precedents to determine whether to "agree[] or disagree[]" with a national consensus. *E.g.*, *Atkins*, 536 U.S. 313 (explaining that the Supreme Court would "*first* review" the question of consensus "and *then* consider reasons for agreeing or disagreeing with" that consensus (emphasis added)). The government wins by prevailing at either step. So to obtain relief under the Eighth Amendment from capital punishment, a person who commits a sexual offense against a child *must* first prove a national consensus against capital punishment for that crime.[1]

**2.** The conclusion that courts after *Kennedy* must assess anew whether the facts have changed is not only the best reading of the case law, but it is also consistent with the need to interpret the Constitution according to the Supreme Court's history-based approach that has

---

[1] Even assuming a court could grant relief from capital punishment without first finding a national consensus, that would make little difference. Like the question about national consensus, proportionality analysis turns on facts that may change. *Kennedy*, for example, assessed proportionality by consulting social research, surveys, and empirical evidence. 554 U.S. at 443–45. A court cannot assume that this evidence will remain stagnant across decades. Indeed, *Kennedy* couched several conclusions with the qualifier "may," suggesting the result might be different on an updated record. *Id.* at 445. Similarly, *Roper* ruled against the State of Missouri because the State did not provide "evidence of deterrent effect," and psychologists had not yet developed methods "to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." 543 U.S. at 571–73. The Supreme Court's proportionality analysis was thus based on the specific evidence before that court.

predominated for most of this nation's existence.  This Court, as a lower court, is bound by Supreme Court precedent, even precedent that squarely departs from the plain meaning or historical understanding of the text.  But when faced with a precedent subject to more than one interpretation, a court must "resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *majority op. aff'd in part, rev'd in part*, 561 U.S. 477 (2010).  Given the option between plausible interpretations of an opinion, this Court must adopt the interpretation that better aligns with the Constitution's text and history.

For all these reasons, the Court agrees with the principal opinion in *Harmelin* that "[t]he Eighth Amendment is not a ratchet."  501 U.S. at 990.  It would be wrong for a court today to refuse to assess whether the social consensus has changed since 2008.  Lower courts must determine whether *today* there is "a national consensus against capital punishment for the crime of child rape." *Kennedy*, 554 U.S. at 434.  "Each Eighth Amendment case is unique because the prevailing standards of decency vary with each passing moment, thus making each Supreme Court holding confined to its specific external facts and distinguishable." Meghan J. Ryan, *Does Stare Decisis Apply in the Eighth Amendment Death Penalty Context?*, 85 N.C. L. Rev. 847, 848 (2007) (cleaned up).  If any individual criminal defendant is unable to establish a national consensus against capital punishment, then a lower court must abide by the presumption that a challenged law is constitutional and permit the executive branch— state or federal—to proceed with punishment. *Cf. INS v. Chadha*, 462 U.S. 919, 944 (1983) ("We begin, of course, with the presumption that the challenged statute is valid.").

11

III.   **The social attitudes that "currently prevail" appear starkly different from 2008.**

To assess whether a national consensus against a form of punishment exists, the Supreme Court has looked at, among other things, the "historical development of the punishment at issue, legislative judgments, international opinion, and the sentencing decisions juries have made." *Kennedy*, 554 U.S. at 421 (citation omitted).  These indicators have changed substantially since 2008.

**1.** Consider history and legislative judgments.  In *Kennedy*, the Supreme Court highlighted how rarely States used or authorized capital punishment for nonhomicide sexual crimes against children; just six States authorized the penalty, and it had not been carried out in close to 50 years.  *Id*. at 422–23, 434.  But now, the trend runs the other direction.  In the last three years, at least six States—Florida, Tennessee, Idaho, Arkansas, Oklahoma, and Alabama—have enacted legislation authorizing capital punishment for the crime of raping a child.[2]  Many more have proposed similar legislation.[3]  This is the same number of

---

[2] *See* Fla. Stat. § 794.011(2)(a) (2023) (sexual battery offenses against children under 12 years of age is death eligible); Tenn. Code Ann. § 39-13-531 (2024) (aggravated rape of a child under 8 years of age is death eligible); Idaho Code § 18-1508D (2025) (aggravated lewd conduct with a child under 12 is death eligible); Ark. Code Ann. § 5-14-114 (2025) (certain sexual activity with a child under 13 years of age is death eligible); Okla. Stat. tit. 21, § 843.5(K) (2026) (first-time sexual offenses against children under 14 are death eligible); Ala. Code § 13A-5-40 (effective Oct. 1, 2026) (adding rape, sodomy, and sexual torture of victims under 12 years of age to list of capital offenses).

[3] *E.g.*, H.B. 598, 2024 Gen. Assemb., Reg. Sess. (Ky. 2024) (rape of a child under 12); S.B. 1232, 56th Leg., 2d Reg. Sess. (Ariz. 2024) (sexual conduct with a minor under 12 who suffers serious physical injury during the offense); H.B. 1336, 2025 Leg., Reg. Sess. (Miss. 2025) (sexual intercourse with a child under 12 that damages the child's sexual organs); H.B. 1391, 89th Leg., Reg. Sess. (Tex. 2025) (certain sexual offenses against children under 12, regardless of whether the actor knew the child's age at the time of the offense); H.B. 2694, 2025 Gen. Assemb., Reg. Sess. (Va. 2025) (certain sexual offenses against children under 13); H. 4043, 126th Gen. Assemb., 1st Reg. Sess. (S.C. 2025).

Other States have declined to repeal their laws that predated *Kennedy*.  *E.g.*, La. Stat. Ann. § 14:42; Ga. Code Ann. § 16-6-1; Mont. Code Ann. § 45-5-503; Okla. Stat. Ann. tit. 21, § 1115; S.C. Code Ann. § 16-3-655; Tex. Penal Code Ann. § 12.42.  Because federal courts may only "enjoin named defendants from taking specified unlawful actions," not "enjoin

States that authorized the penalty when *Kennedy* was decided, a number the Supreme Court acknowledged "show[ed] divided opinion." *Id.* at 426, 431. And although the Supreme Court found six States to be a weak consensus in *Kennedy*, it also acknowledged that "national consensus is not confined to tallying the number of States with applicable death penalty legislation." *Id.* at 426.

Courts must also consider the pace and consistency of change. "'It is not so much the number of these States that is significant, but the consistency of the direction of change.'" *Id.* at 431 (quoting *Atkins*, 536 U.S. at 315). Here, nearly 25 percent of States that authorize the death penalty have extended it to forms of child rape in just the last three years (not counting States that declined to remove the penalty from the books after *Kennedy*).[4] That is one quarter of the time it took for six States to do the same between 1995 and 2008, and it is less than one fifth of the time it took for five States to abolish the death penalty for minors in *Roper*. *Id.* at 432–33. By any metric, this pace and consistency is rapid and at the very least "shows divided opinion." *Id.* at 426.

The recently enacted legislation is particularly noteworthy because of the common assumption that these bills are unenforceable unless *Kennedy* is overturned. The Governor of Florida, for example, explained that he signed the legislation to help create a test case "to be able to challenge that precedent." Kit Maher, *DeSantis Signs Bill Making Child Rapists Eligible for Death Penalty at Odds with US Supreme Court Ruling*, CNN (May 1, 2023).[5]

---

challenged laws themselves," *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (cleaned up), those statutes automatically are enforceable to the extent an offender is unable to prove a national consensus against capital punishment.

[4] As of June 2026, 27 States plus the Federal Government authorize the death penalty. *See* State by State, Death Penalty Information Center, https://deathpenaltyinfo.org/state-and-federal-info/state-by-state. [https://perma.cc/LJB6-GX96]

[5] https://www.cnn.com/2023/05/01/politics/desantis-child-rapists-death-penalty-bill-scotus [https://perma.cc/9QZT-VZUC]

Similarly, Arkansas made legislative findings that "[t]he United States Supreme Court gravely erred in *Kennedy v. Louisiana* when it held that the Eight Amendment prohibited imposition of the death penalty for rape of a child when the crime did not result in death of the victim," and Arkansas suggested that the "outcome" might have been different if that State had joined the other States authorizing the penalty.  S.B. 375, 95th Gen. Assemb., Reg. Sess. (Ark 2025).[6]

As this Court explains, the view that *Kennedy* currently prohibits this punishment is mistaken (but understandable); on its own terms, *Kennedy* permits the death penalty if a criminal defendant is unable to prove a national consensus against capital punishment.  But the willingness of States to expend limited resources to enact legislation that they think is currently unenforceable underscores how strongly these States believe in their policy.  The strength of that legislative judgment counts for more than traditional laws that a legislature expects will be enforced immediately and weighs against any argument that a national consensus against capital punishment remains.  *See Gregg v. Georgia*, 428 U.S. 153, 180–81 (1976) ("[A]ll of the post-Furman Statutes make clear that capital punishment itself has not been rejected by the elected representatives of the people.").

Indeed, while *Kennedy* determined, in the confines of that case, that there were "compelling reasons not" to "find contemporary norms based upon state legislation that has been proposed but not yet enacted," 554 U.S. at 431, proposed legislation here may be more meaningful.  Legislation proposed before the Supreme Court granted certiorari in *Kennedy* had little probative value because States had a reasonable expectation that they could enforce their laws.  There was no reason for a court to suspect that proposed legislation failed because

---

[6] https://arkleg.state.ar.us/Home/FTPDocument?path=%2FBills%2F2025R%2FPublic%2FSB375.pdf [https://perma.cc/TG8T-ESKX]

of Supreme Court doctrine.  Today, by contrast, it is plausible that the only reason some States have not enacted legislation is because of fear that the legislation would be declared unconstitutional under *Kennedy*.  Proposed legislation in this context has greater relevance to assessing national consensus.

Missouri has recently joined those States proposing legislation.  In *Kennedy*, a bipartisan set of three current or future Governors submitted amicus briefs arguing in favor of capital punishment.  *See* Brief for Missouri Governor Matt Blunt and Members of the Missouri General Assembly as *Amici Curiae* Supporting Respondent, *Kennedy v. Louisiana*, 554 U.S. 407 (No. 07-343) 2008 WL 742922 (also including future Governor Michael Parson); Brief for Texas, *et al.*, as *Amici Curiae* Supporting Respondent, *Kennedy v. Louisiana*, 554 U.S. 407 (No. 07-343) (including future Governor Jeremiah Nixon).  The first brief highlighted a horrific case involving child abduction and repeated rape, where the offender received 74 life sentences.  Blunt Br., 2008 WL 742922, at *3.  The General Assembly apparently came close to enacting legislation but took no floor vote while *Kennedy* remained pending.  *Id.* at *2 ("Governor Blunt publicly proposed that Missouri authorize the death penalty for child rape. . . .  Pursuant to that recommendation, legislation has been duly introduced in the General Assembly and is working its way through the legislative process."); Mo. S.B. 1194 (2008) (passed committee and placed on the calendar for perfection).  The General Assembly of Missouri is considering that policy again after a long hiatus, now able to make a good-faith argument that there is no longer a national consensus against capital punishment for the crime of child rape.  Proposed legislation has been introduced in at least each of the last three sessions.  *E.g.*, S.B. 1697 (2026); S.B. 196 (2025); S.B. 951 (2024).

**2.** Another stark change since 2008 is the stratospheric increase in sexual crimes against children.  Three years before *Kennedy* was decided, fewer than 100 offenders each

year were convicted in federal court of child pornography production.[7]  U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography: Production Offenses* 3 (2021).[8]  By 2019, that number had exploded by 422 percent.  *Id.*  It is almost certainly still increasing.  Because of technological changes since 2008, these crimes are easier to commit and harder to detect. *Federal Sentencing of Child Pornography* at 2 ("Emerging technology continues to create greater opportunity for child pornography production offenders to access and exploit minor victims.").  For example, offenders increasingly commit these crimes remotely by coercing children in other locations to produce child pornography through an online platform.  *Id.* at 5 (representing one-third of offenses in 2019).  And end-to-end encryption, for all its privacy upsides, has the serious downside of enabling child pornography offenders to distribute images undetected.  Thomas Barrabi, *Meta Risks 'Blindfolding' Itself to Child Sex Abuse with Expanded Encryption, Agencies Warn*, N.Y. Post (Apr. 19, 2023).[9]  Because of all these technological changes, the internet is now "overrun with images of child sexual abuse." Michael H. Keller & Gabriel J.X. Dance, *The Internet Is Overrun with Images of Child Sexual*

---

[7] *Kennedy* likely does not apply at all to crimes involving child pornography.  *Kennedy* concerned only the crime of raping a child, not other sexual offenses against children.  The Supreme Court has never ruled on capital punishment for those crimes.  Although *Kennedy* includes some broad general language, the Supreme Court "has often admonished that general languages in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering."  *Turkiye Halk Bankasi*, 598 U.S. at 278 (cleaned up).  As explained below, offenses involving production of child pornography differ in important ways from offenses involving child rape that do not also involve production or distribution of child pornography.  In particular, child pornography offenses could be described as "offenses against the State," not merely offenses against individual victims, and *Kennedy* expressly said its holding did not address that kind of offense.  554 U.S. at 437.

[8] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf [https://perma.cc/NTP3-9CYE]

[9] https://nypost.com/2023/04/19/meta-risks-blindfolding-itself-to-child-sex-abuse-agencies-warn/ [https://perma.cc/3QGM-5V57]

16

*Abuse. What Went Wrong?*, N.Y. Times (Sept. 29, 2019).[10]  There were more than 100,000 reports of child pornography images in the United States when *Kennedy* was decided.  *Id.* Ten years later, that number exploded to 18.4 million, an increase of 18,300 percent.  *Id.* "[T]he crisis," which did not exist when *Kennedy* was decided, is now "at a breaking point."  *Id.*

**3.**  These technological changes also narrow the gap between homicide and nonhomicide offenses.  *Kennedy* made a fact finding that nonhomicide crimes "cannot be compared to murder in their severity and irrevocability."  *Kennedy*, 554 U.S. at 438 (cleaned up).  It is far from clear that proposition is still true.  Rape offenses against children typically impose greater harms than they used to, and those harms often extend far beyond the direct victims.  As with the case at issue here, many crimes involving rape also involve production of child pornography.  And when an offender distributes child pornography, it is impossible to permanently delete those images.  *See* U.S. Sent'g Comm'n, *Federal Child Pornography Offenses* 41 (2012).[11]  Images and videos of child pornography routinely are stored online in a decentralized format like BitTorrent that makes media permanent.  *See Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 554 (5th Cir. 2024) (files "maintained through a decentralized network of independent computers" are often "permanent") (cleaned up); *see also* Primavera De Filippi, et al., *Blockchain Technology and the Rule of Code: Regulation Via Governance*, 92 Geo. Wash. L. Rev. 1229, 1251 (2024) (noting that other decentralized networks such as blockchain can also be used for this purpose).  Because these images "may spread to thousands of computers" in a short amount of time, "once a picture has been copied and

---

[10] https://www.nytimes.com/interactive/2019/09/28/us/child-sex-abuse.html [https://perma.cc/Q7X6-UQZ9]

[11] https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf [https://perma.cc/QKE5-QCEU]

distributed over the Internet, its further distribution is wholly out of control." *Federal Child Pornography Offenses* at 41 (cleaned up). And because these files, by design, are located on innumerable servers, they may remain accessible for decades or longer. *Van Loon*, 122 F.4th at 554 (files on decentralized networks like blockchain are "publicly viewable forever"). Certain sexual offenses against children now very much might "be compared to murder in their severity and irrevocability." *Kennedy*, 554 U.S. at 438 (cleaned up).

For example, the Court recently received an impact statement from a victim who was sexually abused more than 50 years ago. Images from that crime are still being traded online as of 2025 through BitTorrent files. *United States v. Thomas*, No. 4:25-cr-00152, ECF 79-1 (Apr. 22, 2026). Whether a victim dies of natural causes years after a crime or—as is all too common—tragically dies by suicide, those images may (and likely will) continue to be traded long after death. In that way, child pornography offenses harm not only the direct victims; they may also be "offenses against the State," which *Kennedy* excluded from its holding. 554 U.S. at 437 (describing "treason, espionage, terrorism, and drug kingpin activity" as "offenses against the State" that may not be subject to the same limits on capital punishment, even though individual victims are also affected by these crimes); *see also Federal Child Pornography Offenses* at vi (describing "child pornography offenses" as crimes that cause "perpetual harm" and harm society as a whole by "normaliz[ing] the sexual exploitation of children").

**4.** Also relevant are the trends in sentencing. Of course, capital sentences for nonhomicide sexual offenses against children dropped to zero after *Kennedy* because of *Kennedy*. But downstream consequences of *Kennedy* are not relevant under the *Kennedy* framework because a judicial decision like *Kennedy* can "block[] the emergence of [a]

18

consensus." *Kennedy*, 554 U.S. at 429.  Much more meaningful, then, are the noncapital sentences regularly recommended or authorized for sexual offenses against children.

Those sentences are substantial and increasing.  Consider the nationally recommended sentences for these offenses.  The U.S. Federal Sentencing Guidelines divide sexual offenses against children into multiple categories.  One of those categories includes producing child pornography.  U.S. Sent'g Guidelines Manual § 2G2.1 (2025).  In the last five years, the Guidelines recommended a *minimum* sentence of life for more than 1200 offenders in that category.[12]  There are many other Guidelines categories that concern sexual offenses against children.  And there are many other offenders for whom the Guidelines recommended a sentence *up to* life.

To be sure, some judges deviate from the Guidelines more often in child pornography cases than in other cases.  But that deviation appears to be confined to cases involving only possession, receipt, or distribution of child pornography, not production.  *See Federal Child Pornography Offenses* at iii (identifying "stakeholder[]" dissatisfaction with the Guidelines, but only in "non-production cases").  And this deviation is in sharp tension with congressional policy.  Dissatisfied with what Congress determined to be overly lenient sentences, Congress enacted legislation directly amending the Guidelines to increase sentences for child pornography offenses.  *See* Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT ACT), Pub. L. No. 108–21, 117 Stat. 650 (2003).  To date, this appears to be the *only* time Congress has done so; in every other context of criminal law, Congress deferred to the Sentencing Commission to craft recommended sentences.  *See*

---

[12] *See* Judiciary Sentencing Information system for offenders with an offense level of 43 and any criminal history under Guideline category § 2G2.1, https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last accessed June 9, 2026).

U.S. Sent'g Comm'n, *The History of the Child Pornography Guidelines* 54 (2009)[13] (noting that child pornography is the only area where Congress has directly amended the Guidelines); *see also id.* at 6 ("Congress has specifically expressed an intent to raise penalties associated with certain child pornography offenses several times through directives to the Commission and statutory changes aimed at increasing the guideline penalties . . . .").

Critically, Congress did so when it understood the Guidelines to be mandatory; the Supreme Court would not issue its decision rendering the Guidelines advisory for two more years. *See United States v. Booker*, 543 U.S. 220 (2005). So at the time, Congress's decision to directly amend (and increase) the Guidelines had a practical effect similar to a statutory mandatory minimum. That judges now can easily deviate in child pornography cases from Guidelines that Congress believed to be binding is a historical accident, and it is an accident expressly contrary to Congress's plain intent. Those below-guideline sentences thus cannot establish a national consensus favoring lower sentences.

Indeed, even though some judges persist in regularly issuing below-guideline sentences, judges as a whole have steadily taken child pornography offenses more seriously in recent decades. So has Congress. Because child pornography offenses require use of modern technology, the laws are relatively new. For example, Congress did not ban simple possession of child pornography until 1990. *See* Child Protection Restoration and Penalties Enhancement Act of 1990, Pub. L. No. 101–647, Title III, § 323, 104 Stat. 4789, 4818 (1990). But once Congress took these issues more seriously and compelled the Sentencing Commission to increase the Guidelines, the average sentence for a child pornography production offense skyrocketed in just five years from 153 months to 283 months. *Federal*

---

[13] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf [https://perma.cc/3YF2-EM3Z]

*Child Pornography Offenses* at xvii.  Sentences for non-production offenses also nearly doubled after Congress compelled the Commission to amend the Guidelines.  *Id.* at x.

Many judges in recent years have issued sentences conveying their determinations that penalties ought to be higher than currently authorized.  In April, for example, a federal court sentenced an offender (who raped an 11-year-old child and pressured minors to create child pornography) to four life sentences plus 280 years.[14]  In 2020, a federal court sentenced a 54-year-old man to 200 years for repeatedly raping a child and producing and possessing child pornography.[15]  In 2024, a Florida state court gave a woman 21 life sentences after she committed sexual offenses against her own children.[16]  A prison sentence longer than life is symbolic.  It conveys a message that a just sentence would be higher than what is authorized by statute.  Even the Sentencing Commission, which has often been at odds with Congress on these issues, has determined that the Guidelines are "too lenient" for some offenders.  *Federal Child Pornography Offenses* at xviii.

All this reveals that there is a diversity of opinions when it comes to punishing child pornography offenses.  But on balance, sentences are harsher than they used to be.  While some judges have told the Sentencing Commission that they believe certain child pornography offenders "should receive straight probationary" sentences, *The History of the Child Pornography Guidelines* at 16, most judges impose substantial penalties, including multiple life sentences.  This diversity of opinion undermines any suggestion that there is a national consensus favoring more lenient sentences in child pornography cases.

---

[14] https://www.justice.gov/usao-ndal/pr/convicted-sex-offender-receives-multiple-life-sentences-prison [https://perma.cc/CQ2G-ZPD2]

[15] https://www.ice.gov/news/releases/central-indiana-man-sentenced-200-years-prison-sexually-exploiting-minors-possessing [https://perma.cc/WT59-ED5M]

[16] https://www.nbcmiami.com/news/local/florida-mom-sentenced-to-multiple-life-terms-for-sex-crimes-against-her-own-kids/3348185/

The timing of congressional action is also relevant. As already mentioned, Congress directly amended the Guidelines in 2003, when the Guidelines were still mandatory. And just a few months after *Kennedy* was decided, Congress enacted "three new laws amending child pornography statutes and creating a new offense" for a specific kind of image creation. *The History of the Child Pornography Guidelines* at 1. *Kennedy* never assessed child pornography laws and could not have assessed those laws that came after it was decided.

**5.** Other assertions that *Kennedy* considered have likewise changed since 2008. *Kennedy* said, for example, that the problems of unreliable child witnesses disfavored capital punishment. 554 U.S. at 443. But the risk of a child witness leading a jury to impose an incorrect conviction is now much lower. What makes some sexual offenses against children often so difficult to detect—the electronic nature of these crimes—often makes proof of them simple. Prosecutors now have less need for children to testify. An offender's own device often provides the evidence against him in the form of highly incriminating images and videos.

*Kennedy* also argued that there is a wide gulf in the "severity and irrevocability" between capital punishment and life in prison. 554 U.S. at 438. But that gap is not so large as it was thought to be in 2008. Recent scholarship has focused on the toll that life in prison takes on an offender, especially when an offender is placed in solitary confinement. *E.g.*, *Davis v. Ayala*, 576 U.S. 257, 288–89 (2015) (Kennedy, J., concurring) (discussing "a new and growing awareness" of the toll of solitary confinement on inmates and explaining that the matter "has not been a matter of sufficient public inquiry or interest" before 2015); *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017) ("Now, with the abundance of medical and psychological literature, the 'dehumanizing effect' of solitary confinement is firmly established."). If life in prison is harder on offenders than the research suggested when the Supreme Court decided *Kennedy*, and if the toll of confinement imposes "irrevocable"

22

difficulties on offenders, a court may find that the gap between life in prison and capital punishment is less than once thought to be true.

**Conclusion**

It is not for this Court to say what the most appropriate charge is for a crime like the one Moore has committed.  The Constitution commits that decision to legislators and prosecutors.  Those actors chose not to press heavier charges here, which may reflect their view that this offense, though severe, was not as egregious as other sexual offenses.

But to the extent prosecutors and legislators are declining to seek historically authorized penalties like capital punishment because they think *Kennedy* categorically prohibits those punishments, that view is mistaken.  *Kennedy* said nothing about offenses that involve child pornography.  And for other offenses, *Kennedy* requires courts to make a factual determination about whether there is a national consensus today against the death penalty for the crime at issue.  The Supreme Court made that fact finding in 2008.  But since then, sexual offenses against children have exploded in frequency and harm, the concerns the Supreme Court expressed about evidentiary issues and proportionality have dissipated, and a groundswell of States in just the last three years have enacted legislation to impose capital punishment on these offenders.  Society can "evolve" in ways that take crime more seriously and give children greater protection.  A court need not reflexively conclude today that the Constitution prohibits historically authorized penalties like capital punishment against those who commit sexual offenses against children.

Dated this 24th day of June, 2026

_____
JOSHUA M. DIVINE
UNITED STATES DISTRICT JUDGE
FOR THE EASTERN AND WESTERN
DISTRICTS OF MISSOURI

23